Good morning, and may it please the Court. My name is David Katz. I represent the appellant, Garth Kloehn. I'd like to reserve four minutes of my time for rebuttal. I would like to, if time permits, address three issues and, of course, answer any questions that the Court may have about any issue that we raise. The first one would be the recess continuing with the denial of any time whatsoever during Mr. Kloehn's testimony. The second one would be the failure to give a venue instruction in a case where venue was very much an issue for the jury had the instruction been given. And also the denial of the speedy – excuse me, the granting of the exclusion of time under the Speedy Trial Act, which was error and was not even based on the record, according to the government. It was not supported by the record. So I'd like to try to get to those. With regard to the denial of the continuance, there was a tragedy that occurred during the trial, and it needed to be addressed by the Court. But it was opposed by the government, and no time whatsoever was given to Mr. Kloehn. The chronology was that while his son had been very ill, he wasn't in a fatal situation, an imminently fatal situation, until he was rushed to the hospital on Monday. Monday was a court recess day. The first thing Tuesday morning, he presented a letter, or the doctor presented a letter, the emergency room doctor, which said that Garth Kloehn's son, Kevin, had only a couple of days to live. We presented that the first thing in the morning. We asked in a colloquy, which is in the excerpt of the record, for at least a couple of days. If there had been a continuance to Thursday, there would have been a five-day break, but there was already a three-day break. We'd already taken a five-day break for the Thanksgiving recess during the trial, and there would have been tremendous utility to it. Now, on Monday, you would have resumed on Thursday, you said? And that would have been a five-day break? We'd already had a three-day break when we came in first thing Tuesday morning. Okay, so you would have added Tuesday and Wednesday? Right. And so there would have been tremendous utility. Now, the government says… Did he follow his testimony then, or had he already started his testimony before the recess? He already started to testify, and he testified on direct on November 23rd, 29th, and 30th. But here we were on December 7th, the morning of December 7th, just about four years ago. And the utility of it would have been that while he would have still been, obviously, sad and very upset about what had happened to his son, he wouldn't have had this tremendous obsessive anxiety. I understand the effect, but where would he have had to go? He lived in Las Vegas. His son was being treated at the emergency room in Las Vegas, and then basically he'd gone home on that same day that we're asking for the recess, he'd basically gone home to die. And the client could have been with him instead of having to be on the stand that very day. Now, the prejudice, there was certain utility to it. There was no inconvenience. The government didn't argue any inconvenience. The court didn't find any inconvenience whatsoever contemporaneously or at any other time. We had been diligent. Obviously, the exact date of death is completely unpredictable. You said prejudice. Were you going to tell us what the prejudice was? And then the prejudice, which is the fourth and an important element, obviously, came about in many ways. Number one, he was completely unable to focus the evening before this critical testimony of his. This was going to be some more redirect and the re-re-cross. It was a critical day. As it was, it was the day that he got hammered out of the blue with this invented sexual impropriety, which was very maladroit, although we were able to sort of get back to square one. So he comes in under the duress of what's happened, and you say he was completely unprepared and he got hammered. Was there a motion made at that time to recess for a couple of days while he could gather his thoughts? Very much so. We presented the letter from the emergency room doctor first thing that Tuesday morning. No, I think we got that after he got hammered. After. Oh, well, again, during the, say, well, we really need to take a recess right now. Your Honor, it was obvious that the judge was not going to grant a recess. But you didn't make the motion. We did not make a motion during the particular testimony where they raised the issue of sexual impropriety. And where is it established that he was so undone that he was unable to focus during a critical part of the trial? I think if you look through the transcript that day, you'll notice a couple of things. Number one is that the day was, as I say, his testimony was sort of maladroit. So we have to tease it from the record. We don't have to tease it from the record. I said to the court right when we moved for the one or two-day continuance, I said, you know, he was not able to focus last night. I represented that as an officer of the court. He was standing right there by my side. Nobody contested that it made all the sense in the world that he had not been able to focus. He'd been given a letter from the emergency room doctor the late afternoon before, your son will die in a couple of days. Then when he was actually on the stand, second thing is that, yes, there was all this maladroit testimony. There were all these stumbles. There were all these things where the government said, ha, ha, ha, we got you on this, we got you on that. And that was a major part of the closing argument. On top of that, the government said at the time that we were trying to get the continuance, they said, well, we're not going to have any witnesses. Then they said, you know what, we actually are going to have a couple of rebuttal witnesses, but they'll be real short. As it turned out, of course, all my client was thinking about on the stand was getting back to Las Vegas. So he was, he didn't attend the very final part of the trial. So he was not able to be there, right, because he was between this unbelievable rock and hard place, Your Honor. And was there any, what prejudice can you point to from his absence, if any? Well, I think any reasonable defense attorney would have wanted to, first of all, have his client there. It's a confrontation, right, during the testimony of his client. So this is just, you're giving me an abstraction. Well, I'm not giving you an abstraction because... What happened here, anything? Well, how would the testimony, so let's say continuance granted. How would your client's testimony have been different than it was? He would have still been sad. He would have been very despondent. But he wouldn't have held that tremendous as a sort of... Substantively. For whatever relevance that may have. Yeah, like how would he have, how could he have presented his case better factually, substantively? I mean, how would it have made a difference in the outcome? Well, he was asked some very important questions that day. He was confronted with some... What did he cover besides the payments for the condominium for the mistress? Was that part of it? And at first he said, the governor said to him, well, that was a relationship that your wife wasn't happy about. And he actually answered yes. He just answered yes to all the governor questions that day. And then when we actually went, luckily we had a brief recess then, at least for ten minutes. He said, well, what happened, what happened? You paid for all these other people too? It wasn't just the way the governor depicted it. And then we were able, because we were able to call Las Vegas and talk to people who still had the records, that they paid for condominiums for 12 different people. It was all the most standard. So let me get this straight. He said his wife wasn't happy with this arrangement? The governor said, was this the type of relationship your wife wasn't happy about? He said yes. And the answer should have been no, that she was happy with it? In fairness, if the way he testified in the days before that, he would have said no, because it's not the way you're making it sound at all. And so there was a certain submissiveness. And I think that you can see that in the record. You don't have to tease it out. But on top of that, we also had the closing argument. I wanted to go over the closing argument with him. Now, this was an important case where he had been there for not just this trial, but the trial before. He's not a well-educated person. He's not trained in accounting or anything like that. But he's a savvy person in the sense that I would want to go over my closing argument, what points to stress. I would want to go over even some things in the jury instructions were important. There's an example, Your Honor, where he corrects me actually in court where I was saying, you know, his son had a stroke. He said, no, it was a massive seizure. So there were instances that you could see on the record where he was an assistance to me. He would have been much more of an assistance to me. But this is the final episode in his son's sorry demise. Earlier in the trial, had you asked for continuances based on his son's health situation? I tried to change venue in August to Las Vegas. And there was some medical records, which are in the excerpts, which show that the son was definitely in bad shape. But he was not in this fatal situation. The request to transfer venue to Las Vegas was denied. Was that the only time that the son came up as a reason to postpone anything? Then I tried to change the date from, I think, November 15th when it started to about the beginning of December because his son was in bad shape and the judge said, no, let's just start the thing. And so I think those are the key elements of the prejudice. And I think that it all makes an awful lot of sense. It's like the prejudice cases where there has been some showing of prejudice. It doesn't have to be we don't have a crystal ball. But given we don't have a crystal ball, there were an awful lot of indicia of it. And I asked the next day, too. I asked the next day when he came back. I said, you know, I had so much trouble preparing. I had trouble doing this. I had trouble doing that. And I said to the judge, would you please suspend? And I was going to make more of a record. And the judge said to me, stop. No disrespect. It's not about your son. We are proceeding. So if the government faulted me for not making even more of a record the next day when I asked yet again, the judge told me stop. And she wasn't kidding when she said things like that. You know, this unfortunately is reviewed under an abusive discretion standard. If I had been the district court judge, you would have had your continuance. There's no question. So this really comes down to, for me, how his testimony and his inability to participate in the rest of his defense was prejudicial to his case. He hadn't missed one day of the trial up until then. He was someone who really wanted to be there for trial. One of the key things to go over for the closing argument was his own testimony. My defense case was basically his testimony. If you look at the clock, he probably testified for one-half of the total trial. To make a closing argument about this trial was to go over his testimony. We didn't have a daily for every day of his testimony. We didn't have a daily for that day that he testified on Tuesday. And then I'm trying to give a closing argument Wednesday, and I think it was Thursday I made my closing argument. And I don't have him there. And just a two- or three-day continuance, the inconvenience is so tiny. This court has written over and over again in decisions that a one- or two-day continuance is really de minimis. Well, this is true, but you have to view everything. I think you have to view everything in context. There had already been one trial during which there was a hung jury, and this was the second trial. This thing had been going on forever, chewing up the judge's entire calendar for a lengthy period of time. Is that a factor that we can look into? Yeah, you have to get this at some point. It has to be over. If the court had made a finding or even a suggestion that there had been some inconvenience, in other words, if we were going to lose a juror, let's say it had been three weeks and so we were going to lose jurors, but we had all 12 jurors, we had all two alternates, everybody was in the box, everyone was fine. None of the jurors were asking for more time. During the first trial, I'm really glad that you mentioned it, she said, you know, I know you're stuck. I'm not, but go ahead. She said, you know, I'm really sorry to hear about your son. And, you know, if you need a day for your son's health, you'll have it. And she gave him a day during the first trial when he merely wasn't well. Here he was about to die and she wouldn't give him a day the second trial? It was unreasonable, very unreasonable, Your Honor, even under the standards that had been set. A juror needed to go do an interview. The juror was excused for a day. That wasn't a problem. So with the supposed inconvenience, the juror was given that time. Do you think the judge lost patience with you, for example, when she kept asking you if you'd be ready for trial and about 10 or 11 times you didn't answer? Do you think she'd lost patience with you by then? You mean with me personally? Yeah. I certainly hope not because it rebounded to the detriment of my client in a way that prejudiced his rights. And I was putting on a vigorous defense of my client. We had seven to five on the jury. The government had pared down the charges. Then they brought them in through the back door. So they brought in all of this prejudicial stuff. You know, I don't want to spend a lot of time arguing. I'm aware of that. But did you sense that she had lost patience with you and was just reacting rather than thinking? Or penalizing your client for you, as you suggested. Well, that day also contained the unfortunate, that very day contained the unfortunate thing about the venue thing. Because there we were in the morning, we had that thing which was really unfathomable. I know you say it was very unreasonable. It was unfathomable not to give them a day or two under those circumstances. And that very day the judge said, you know what, to the government, I know you put in these venue instructions, but I'm not going to instruct on venue. I don't think it's really necessary. And the government's first reaction was, well, you know, you have to show venue and jurisdiction. And the judge said, no, no, no, I don't think so. And then the government should have stood up to that and said, you must give this instruction or it's a new trial. But instead they caved in on that. The government, excuse me, the court pulled back that instruction. The next day when the court made clear, I will not give it, I said twice, they have to be instructed this way. This wasn't that I had such a crystal ball. Other circuits had ruled the way this circuit would rule in cash. It was clear that that's the way the wind was blowing. We had not so ruled yet. You had not so ruled yet, but the Tenth Circuit had actually gone further than the Ninth Circuit. So we had a Tenth Circuit decision sitting out there, which made it clear. Well, if you want to get into that issue, wasn't it harmless error? No, it wasn't. I mean, it's pretty clear to me looking at this record that Los Angeles had a handle on this case. No, it wasn't harmless error at all. There were only two things that supposedly, first of all, the government had to show an affirmative act and the jury had to all agree on one affirmative act. They didn't have to agree on all the affirmative acts. The most likely affirmative act without a special verdict or without anything like that, the most likely affirmative act that the government all, excuse me, that the jury all agreed on was that he didn't file an income tax return that was proper, which was filed from Las Vegas, and that he accrued money to Exeter, which wasn't, according to the government, really going to be used for European marketing purposes. He did all of that in Las Vegas. What did he do in California? The only two things that he supposedly did in Las Vegas and in California, and again, there's no reason to think that the jury was unanimous on that affirmative act, was that this fellow, Spicer, who had been the audit counsel and whose office was only in Los Angeles and who wanted to have the audit be in Los Angeles. Because a substantial portion of the taxpayers' business activity took place in California. Yes, yes. And Mr. Colon's principal place of business was in Los Angeles. And the IRS, within about a month, got to the bottom of the fact that that was an untrue statement. And, in fact, in the excerpts of record, there's a great memo from the IRS which says, you know, Spicer told us that, but all the books and records are actually in Las Vegas. So nothing was here. The only thing that was here was Spicer, and the IRS knew. And then the IRS wanted to send the case back to Las Vegas because it made no sense. There was no center of gravity at all in Los Angeles. And the IRS, for its own purpose, figured, look, keep going here, and we'll go around the back door in Las Vegas and we'll get an interview with a client in Las Vegas. But they ended up showing up on a date that he was elsewhere. The only other thing was that Archer, who was the tax preparer, the one who got the straight probation in this case, the tax preparer, he lived in Anaheim. But the key thing is that there's no evidence in the record that he prepared any of the returns in Los Angeles. In fact, Bianchini, who was no friend of ours, he was the CFO who got a reward from the IRS for his information, said it was really funny. I'd have to leave the keys and the computers on and stuff like that because this fellow Archer would come on the weekend, he'd hang around on the weekend, and then he'd leave the tax return filled out for Garth to sign in Las Vegas. So there was no venue. And the question is, was there substantial and uncontroverted evidence? And there certainly wasn't. Do I have two minutes and a half left? Yes. I'd better stop then. Thank you. Unless there are other questions. Thank you very much. Please support the assistant attorney, Ruth Ingle, on behalf of the United States. I'm going to ask you a question. Judge Wardlaw said the problem for her was is this an abuse of discretion? You don't think that a judge who refuses to give a day or two's continuance so that a father can be with a dying son is abusing discretion? Particularly as Judge Crock pointed out, this trial had been going on for a long time. Another day or two certainly wouldn't be something extraordinary. But to you, that's a reasonable judge acting in a reasonable manner? Well, Your Honor, what the court was asking, the information the court had about the son's condition is that not that he would die, there's nothing in the records that said he would die within one or two days, is that it would be within the next few days, which is sort of a problem. Oh, come on. And, Your Honor, the other one. You're not serious. In the next few days, we thought it was three days instead of two? Well, Your Honor, in the continuance request, well, here's the problem. The trial was almost at its end. It had gone on. Were you the trial lawyer? Yes, I was, Your Honor. Did you actually oppose the continuance? Yes, Your Honor, we did. Why? Because at the time the request was initially within the same. If your son had been dying, would you not have wanted a continuance, and don't you think a fair court would have given it to you? Your Honor, within the context of this case and given the information the court had at that time, the continuance request actually was up to five days. It was initially Mr. Katz said two to three. Then he said, just a few moments later, up to five days. The information that the court had is not that the son would die that day. I think if everyone had known that that was the problem, it may have been. Really, what was the – if none of the jurors had a problem, if you – the trial was almost at its end, what was the prejudice to the government? It was no indication when the trial would resume. The fact that the matter is the – Did you ask, well, can we set a date for the resumption of the trial? No, we didn't, Your Honor. We just wanted the trial – You can say we don't want any continuance. We don't care if he dies in one day, two days, or three days. Your Honor, we didn't have the information that the son would die that day. And at this point, the defendant – the government's case in chief was four days. The defendant was on the stand for his sixth day. But you really – I mean, I don't know. It strikes me that it's not very fair to – I mean, look, there's overwhelming evidence here. I realize it was a frustrating case for everybody. And a difficult case for the government to put on. But you're forcing someone to participate in the trial knowing their child is dying or to not – to have to leave the trial with a lot on the line. Well, Your Honor, in the context of this case, the defendant had actually missed days in the – at least one day in the first trial. It wasn't unusual for him to not be present at the trial. He absented himself frequently. And in this case – He did say he missed one day. Pardon me? He absented himself frequently. At least one day from the first trial. Is that frequently? Your Honor, at least one day from the first trial. All right. One day frequently. In addition to all the pretrial competition. Excuse me. All right. He did say he absented himself frequently from the trial. Now, could you stick to the facts and tell us the truth? Your Honor, during the course of this case, the defendant had frequently been absent. Not necessarily from this particular trial. He had been absent. You said the first trial. He was absent for one day. Excuse me. At least one day. And that's frequently. And also with all the pretrial competition. I can see why you objected to the continuance. Your Honor, given the information the court had, the son's cancer had been raised for over a year. We really did not know that the son was – But now he was going to die. They were releasing him from the hospital. He'd had this final episode. They were releasing him to the hospital to go home to die. I don't know that we knew that they had released him from the hospital to go home to die. We certainly knew that he'd had the seizure and that death was within the next few days. What prejudice were you afraid of if you had gone along with the motion for a short continuance? Well, it was actually at least a week's continuance. At least a week. I thought you just said you didn't know it might have been up to five days. Well, the request ultimately was for five days. And that would be the following Tuesday when we claimed him. When, in fact, did the son die? He died that afternoon, the afternoon of December 6th, Tuesday afternoon. So it would have been one day. And so what were you afraid of? What did you think that could happen, might happen? What happened that would tank the trial, if anything? The case had already been, the original estimate of the entire case was two weeks. We were now entering our fourth week. There were concerns that the jury would not even remember what had happened, that we might start losing jurors. And Mr. Katz himself raised that issue with the Court when he, the Court, they were discussing the issue of the continuance. Mr. Katz says, Your Honor, I understand the problem here. We have jurors who may start to have problems with their jobs, and this has gone on very, this trial has gone on very long, and all of us would like to wrap up this trial. Did you have alternate jurors? I believe we had two alternate jurors. But the Court did offer to make accommodations that day. She said, Let's just finish up the defendant's testimony. He's here. Let's finish it up. I'll limit the government's recross examination. And, Mr. Cohn, then you can just leave. But I don't know if that's an appropriate choice to put the defendant to, to leave the end of a trial. I mean, he's on trial, and he's going to be absent. And her, I guess Mr. Katz didn't get to argue this, but I also found her statement to the jury about his reasons for being absent, it seemed almost callous, like he didn't care enough about his own liberty to be present to the end of the trial. I believe what the Court said is that he was unable to be there. Right. But, I mean, you're on, you're being criminally tried by the federal government with a substantial potential loss of liberty. I can't, not only can't I understand the judge's actions, I can't understand the government's. And I think your explanation is, well, I mean, this is a very disturbing case. Your Honor, I know that the judge said in the last case, if you go back and talk to the assistant attorney general about getting a uniform instruction, I don't know what you do about this kind of conduct. Well, Your Honor, in this instance, the Court was, had discretion to make the decision, and given the information the Court had was that death was not going to occur that  the trial had already been over long, and she was trying to balance the various interests of the parties and the defendant, and said, let's just try to finish this up today. Okay. Let's go through the flint factors. Okay. Diligence. Had the defendant been diligent? It seemed like, at least with respect to the second trial, the defendant had been diligent. Second, would the continuance satisfy the needs? Yes. He'd be at the scene when he died. Third, inconvenience to court and government. There were two witnesses left, plus closing argument. There was some uncertainty as to when you would resume, but it seemed within a couple days. I don't know why you didn't, and I'm sure you had other things you could have done in those days. And fourth, prejudice to defendant. Well, I think the prejudice to the defendant from the denial is immeasurable. Your Honor, the defendant was, in fact, present for the remainder of that trial day, and what he missed after that point. No, I'm saying, I understand his son died while he was in transit to Las Vegas. He arrived back before the son died. He died within the hour. Two hours after the trial. Two hours. Okay. You voiced your objection to this motion.  Did you explain that to the judge? My co-counsel did state that we were concerned that the case had already gone on overly long, and we were concerned about the juror's ability to remember anything that had happened. The government had rested two weeks before. Have you ever had a trial longer than this one? Are there ever criminal prosecutions longer than this one? Yes, there are, Your Honor. I have not participated in them that long. There are lots of them, aren't there? There are. I've had patent cases that went on for three to six months, and the jurors didn't forget. And it's a lot more complicated subject. So that was your reason, because you thought that this would be too long a trial for jurors to remember what went on. Your Honor, we also did not have any – Should we find it in longer trials than this, that we should reverse the convictions because we can't expect the jurors to remember what happened? Your Honor, one of the other issues the court pointed out is that the son's cancer had been raised as one of the many reasons for continuances before. We had already had a two-month continuance from September to November, and based in part on the son's cancer, and now we are in the – and that continuance is granted over the government's objection, and now we are in the situation where the defendant had to see the – But you knew it was a – it was – it wasn't like it was a concocted basis for the continuance. You knew he was – the son was really sick and was going to die. It wasn't like, oh, someone's claiming illness, so they need a month off or whatever, which, you know, sometimes that happens, too. They create their own illness because they need time. But this – we knew it was real. Yes, we knew it was real, Your Honor. But there was no indication that, based upon what the court had that day, that it would happen that day. And I have to say, the next day, Mr. – Don't you feel really bad about this situation? I can tell you do. I can tell you feel really bad. It's just a really bad situation. Well, I would think that I would, after this argument, I would go to the U.S. attorney and ask if they really want to pursue this case. Your Honor, you know, unfortunate people – unfortunate things happen to people in their lives, but they are not – they're not cause for immunity from criminal prosecution. Nobody asked him to be immune. He didn't ask that the counsel – that the trial be canceled. Your Honor, I'd also like to point out that Mr. Katz did – the defense did not renew their request for a continuance. After we found out the son died the next morning, that was Wednesday, December 7th, Mr. Katz did not renew the request for the continuance so that the defendant could be present. He did not. He asked the court about 10 or 15 minutes into the morning calendar. I would like a one-day continuance because I've had trouble focusing. He never renewed his request. Had he said right then and there, Your Honor, the defendant really wants to be here, you know, the court may have decided differently, but that issue was not raised. And none of us knew that the son would die Tuesday, December 6th. Well, you would have granted a continuance if the son had already died. You just didn't want him to be there while the son was dying. That would have been a much better reason that his son was dead. No, Your Honor, we did not know that it would happen that day, and the court was simply trying to accommodate, you know, based upon the information it had in front of it, try to wrap it up. You're here, let's wrap it up. But the defendant continued to testify for four hours. And I have to say, he didn't – he appeared completely unaffected by the fact that his son was dying. And this – the government did not hammer – People who act like this would know whether somebody was unaffected or not. Your Honor – It doesn't seem to me – this is a record of people with empathy. And now, I know judges aren't supposed to have empathy, but clearly there was no empathy in this case. Your Honor, the government, despite what Mr. Katz said, the government did not all And there really weren't allegations of sexual impropriety. But the government had raised the issue the prior week that if – that it was going to get into the fact that a defendant had deducted on the corporate tax return and only just for this one person, the payment of rent for someone with whom he had a personal – How was the existence of the mistress relevant to the tax case? Well, it wasn't the existence of the mistress. The fact was that the defendant had testified that he consistently, on his direct examination and redirect examination, that he consistently followed the tax rules. So among other things, the government was bringing in his pattern of writing off personal expenses on the corporate tax return. Initially, what the government went into was his use of someone on the company payroll to build custom homes for himself and his son. And his use of his secretary to track all the expenses for the building of the house. And I believe it was only on re-re-re-cross-examination that the government cross-examined him about the fact that he had a personal relationship with a woman. And the question to him was, was it a relationship your wife wasn't happy about? And he said, yes, she was mad as heck. He didn't just submit to the government. He said, yeah, she was mad as heck. And then the question was, and you deducted that, that rent on the corporate tax return. And he said, yes, he did. It was impeachment by contradiction. On the venue, Your Honor, what I would like to point out is that the instruction at issue was not a venue instruction. At the time, the defendant had objected to the indictment going back to the grand jury. So I had prepared an instruction that, pardon me, to the jury. I had prepared an instruction that was a summary of what the counts in the indictment were, because the jurors were going to have to find affirmative acts of evasion within the statute of limitations, but they would need to know what of what the counts in the indictment consisted. So those were, in fact, summaries of the counts in the indictment. They were not venue instructions. And ultimately, the indictment did go back to the jurors. So to the extent there was any error in that instruction, which, again, was not a venue instruction, it would have been cured by the fact that the indictment itself went back to the grand jurors with the allegation in the central district and elsewhere. Thank you. Thank you. I hope she's giving you good advice, Mr. Katz. I guess not. Just very briefly, if I might. I just want to make clear in the record that the district court itself said the situation was dire. There was a letter from the emergency room doctor that said that Kevin Klum would die within a couple of days, a few days. It was language like that. The continuance from the city. What do you mean a few days? What do you mean language like that? I never trust paraphrasing anymore, because everybody tries to cheat. What did the letter actually say? It said, Mr. Klum has end-staged, is that melanoma? Yes. And in very critical condition. The patient has very little life expectancy, possibly next few days. If court can delay the proceeding so patient's father can be with him on his last days. Next few days. We had 12 jurors. We had two alternates. The continuance from September to November was not on account of Kevin's condition. It was because the government had this Hamlet-like thing, whether they were going to get a superseding indictment from the grand jury or just go with this trial indictment, which was the Speedy Trial Act situation where they violated my client's Speedy Trial Act rights. And the matter, first of all, I want to make it clear. My client did not have a mistress. This was all invented. I ask you to please read the testimony that ensues on the redirect. That makes me less sympathetic now. Okay. And so, Your Honor, we would ask that the court reverse on the basis that we've heard from you guys. Thank you very much. Case is scheduled to be submitted.
judges: Reinhardt, Trott, Wardlaw